THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                     Plaintiff,<br><br>        v.<br><br>JAIME SUAREZ-REYES,<br><br>                     Defendant. | 8:12CR67<br><br>SENTENCING MEMORANDUM |

This Sentencing Memorandum supplements findings made on the record at the defendant's sentencing hearing on November 20, 2012.

**I. BACKGROUND**

Defendant entered a plea of guilty to an Information charging him with executing a scheme to defraud a financial institution by check kiting, in violation of 18 U.S.C. § 1344(1). Filing No. 1, Information; Filing No. 10, Plea Agreement. The offense carries a maximum term of imprisonment of 30 years. 18 U.S.C. § 1344(1). In the plea agreement, the parties agreed that defendant's base offense level under U.S.S.G. § 2B1.1 is 7, and that defendant should be held responsible, beyond a reasonable doubt, for an amount of loss of approximately $693,000, with a Guideline increase of 14 levels under 2B1.1(b)(1)(h), resulting in a total offense level before any adjustment for acceptance of responsibility of 21. Filing No. 10, Plea Agreement at 5-6. The agreement further provided for restitution to FirstTier Bank. *Id.* at 6-7.

The court accepted the defendant's plea but deferred acceptance of the plea agreement pending the preparation of a Presentence Investigation Report (hereinafter, "PSR") by the United States Office of Probation (hereinafter, "the Probation Office") that calculated the defendant's sentence under the United States Sentencing Guidelines ("the Guidelines"). In the PSR, the Probation Office identified U.S.S.G. § 2B1.1 as the

applicable Guidelines base offense level provision and determined that the defendant's base offense level should be 7.  Filing No. 28, Second Revised PSR (sealed) at 11.  It added a 14-level enhancement under U.S.S.G. § 2B1.1(a)(1)(A) for an amount of loss of more than $400,000 but less than $1,000,000.  *Id.* at 11.  The loss amount is $693,776.15.  *Id.*  The Probation Office then subtracted three levels for the defendant's acceptance of responsibility under U.S.S.G. § 3E1.1 (a) & (b), resulting in a total offense level of 18.  *Id.* at 12.

The defendant has no prior convictions or other criminal conduct and his criminal history category is I.  *Id.*  At criminal history category I and base offense level 18, the defendant's sentencing range under the Guidelines is 27 to 33 months.  At the sentencing hearing, both the defendant and the government stated they had objections to the information, calculations and conclusions contained in the Second Revised Presentence Investigation Report.

The offense conduct outlined in the PSR shows that the defendant executed a scheme, known as "check kiting," whereby he manipulated checks between various bank accounts at TierOne Bank and Enterprise Bank to create artificially inflated bank balances through the utilization of float, then used the inflated bank balances for his personal and business purposes.  *Id.* at 5.  The scheme involved the defendant having approximately 18 checking accounts and coordinating the exchange of nonsufficient fund checks between the accounts, enabling him to receive unauthorized monies belonging to TierOne and Enterprise Banks and causing the banks to suffer significant losses.  *Id.* at 5-6.  As a result of the defendant's kiting activities, TierOne Bank suffered a loss of approximately $693,000.  *Id.* at 6.

The defendant was an entrepreneur in the fast food business in Omaha and owned various Subway sandwich shops, Taco Del Mar fast food restaurants, and L'Evento Café coffee shops at various times.  *Id.* at 7.  The defendant and the restaurants were parties in a civil action in the District Court of Douglas County, Nebraska, involving these check-kiting allegations.  *Id.* at 9.  TierOne Bank and the defendant settled the dispute and the defendant agreed to pay the amount of loss, $693,776.15, to TierOne in installments over the following several years.  *Id.* at 10.  To date, the defendant has made 13 payments of $3,000; 13 payments of $3,500; one payment of $4,000; and one payment, on June 12, 2012, of $7,000. His total balance owed is $598,276.15.

The defendant is 51 years old.  *Id.* at 13.  He was born in Mexico, came to the United States in 1983, became a permanent U.S. resident in 1995 and a naturalized U.S. citizen in 2009.  *Id.*  He completed high school and has several years of college. *Id.* at 15.  He is married and he and his wife have four grown children.  *Id.* at 14.  He also has one grown son from a previous relationship.  *Id.*  He is presently working with his nephew in Mexico on a project involving the sale of street lights.  *Id.* at 15.  His income is commission-based and averages between $2,000 and $3,000 per month.  *Id.* at 15-16.

In 2007, he states, his combined businesses were worth at least five million dollars, but by 2009, he had lost everything.  *Id.* at 15-16.  In 2008, sales at his restaurants declined, he had bank loans totaling $400,000 and lost his business due to the economic downturn.  *Id.* at 16.  His lost his home to foreclosure and he lives with his son and daughter in a house they rent.  *Id.* at 13, 16.

The record shows that Suarez-Reyez has he has numerous health problems. *Id.* The PSR indicates he suffers from a liver disease, Esteatosis; kidney stones; protein and sugar in his urine; problems with discs in his back; nerve problems in his leg from broken discs; sleep apnea; oxalate deposits in his joints; problems with cartilage in his shoulder; bowel problems; and diverticulosis. *Id.* at 14. He takes numerous medications, including Hydrocodone, Metformin, Gabapentin, Ibuprofen, Amitriptylyne, Lisinopril, Metoprolol, Salsalate, Dextroamphetamine, Allopurinol, Ondansetron, Promethazine, Clotrimazole, and Betamethasone Dipropionate Cream. *Id.* He is under the regular and constant care of a physician, and is on a restricted diet due to his medical problems. *Id.*; see also Filing No. 31, Hearing Exhibit List, Ex. 1, Medical Report of Dr. Michael Sitorius ("Dr. Sitorius report").

The defendant submitted evidence that he:

> first developed renal calculi in 2007, and since has had "hundreds" of calculi causing symptoms of intermittent severe back pain. He also has had a disorder of calcium metabolism that persists and has no specific diagnostic label. He has calcium oxalate deposits causing both renal stones and calcium deposit pain in some of his joints including shoulders and sternum.

*Id.*, Dr. Sitorius Report at 1. Further, the evidence shows that the defendant's prescribed medications have potential side effects that include "dizziness, somnolence, depression, and fatigue." *Id.* at 2. Further, two of the defendant's medications can cause amnesia, mental confusion, and memory impairment. *Id.*

Based on the defendant's medical conditions, payment of restitution, and employment, the Probation Office recommended a sentence of one day, followed by 5 years of supervised release. The defendant agreed with the Probation Office's recommendation. The defendant moved for a departure under U.S.S.G. §5K2.0 for

4

diminished capacity, aberrant behavior, or extraordinary restitution, or for a variance under 18 U.S.C. § 3553.   Filing No. 21.  The government opposed the defendant's motion for departure or variance and urged a sentence at the low end of the Guidelines range.  The government conceded, however that the defendant had several things to his credit.  The government noted that the defendant agreed to restitution before he was criminally charged, and negotiated in good faith with the government enabling it to avoid the indictment process.

## II. DISCUSSION

### A. Law

The Sentencing Guidelines are no longer mandatory.  *United States v. Booker*, 543 U.S. 220, 260-61 (2005).  Consequently, the range of choice in sentencing dictated by the facts of the case has been significantly broadened.  *Gall v. United States*, 552 U.S. 38, 59 (2007) (finding a sentence outside the Guidelines to be reasonable); *Kimbrough v. United States*, 552 U.S. 85, 100 (2007) (noting that courts may vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines); *Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that a district court may consider arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations"); *Cunningham v. California*, 549 U.S. 270, 286 (2007) (stating that judges are no longer tied to the sentencing range indicated in the Guidelines but are obliged to "take account of" that range along with the sentencing goals Congress enumerated in 18 U.S.C. § 3553(a) of the Sentencing Reform Act). District courts must "give respectful consideration to the Guidelines," but are permitted "'to tailor the sentence in light of other statutory concerns as well.'"  *Kimbrough*, 552

U.S. at 101 (quoting *Booker*, 543 U.S. at 245-46).  These cases "mean that the district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines."  *Kimbrough*, 552 U.S. at 113 (Scalia, J., concurring).

The Sentencing Reform Act "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing, including 'to reflect the seriousness of the offense,' 'to promote respect for the law,' 'to provide just punishment for the offense,' 'to afford adequate deterrence to criminal conduct,' and 'to protect the public from further crimes of the defendant.'"  *Kimbrough*, 552 U.S. at 101 (quoting 18 U.S.C. § 3553(a)).  The statute further provides that "in determining the appropriate sentence, the court should consider a number of factors, including 'the nature and circumstances of the offense,' 'the history and characteristics of the defendant,' 'the sentencing range established' by the Guidelines, 'any pertinent policy statement' issued by the Sentencing Commission pursuant to its statutory authority, and 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'"  *Id.* (quoting 18 U.S.C. § 3553(a)).

Although the Guidelines remain "the starting point and the initial benchmark" in determining a sentence, the district court "may not presume that the Guidelines range is reasonable," but must "make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50.  "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a

party." *Id.* If the court decides that an outside-Guidelines sentence is warranted, the court must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. *Id.*

Congress established the Sentencing Commission ("the Commission") "to formulate and constantly refine national sentencing standards," in fulfillment of its important institutional role. *Kimbrough*, 552 U.S. at 108. When operating within that institutional role, the Sentencing Commission "has the capacity courts lack" and can "'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough*, 552 U.S. at 109 (quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). In formulating the Guidelines, the Commission developed and used data on past practices and recidivism. *See* United States Sentencing Commission, Fifteen Years of Guidelines Sentencing (Nov. 2004) ("Fifteen-Year Assessment") at 14; U.S.S.G. § 1A.1, intro. comment., pt. A, ¶ 3; *Kimbrough*, 552 U.S. at 96; *Gall*, 552 U.S. at 46 (noting that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). Accordingly, in many cases, the Guidelines are a reasonable estimation of a fair sentencing range. *See Kimbrough*, 552 U.S. at 109.

For policy reasons, the Commission did not employ its characteristic empirical approach when setting the Guidelines ranges for white-collar crimes. Fifteen-Year Assessment, Executive Summary at vii, 15, 56 (stating that important considerations led the Commission to depart from past practices for crimes such as fraud). The Commission found that its "study of past sentencing practices revealed that in the

preguidelines era, sentences for fraud, embezzlement, and tax evasion generally received less severe sentences than did crimes such as larceny or theft, even when the crimes involved similar monetary loss," noting that a "large proportion of fraud, embezzlement, and tax evasion offenders received simple probation." *Id.*, Executive Summary at vii. The Commission sought to correct this past under-punishment of "white collar" crimes, based on its determination that "penalties for some types of crime, such as 'white collar' offenses, were disproportionately low compared to other types of theft involving similar economic losses." *Id.* at 15, 38. Accordingly, the Commission drafted guidelines to reduce the availability of probation and "to ensure a short but definite period of confinement for a larger percentage of these 'white collar' cases, both to ensure proportionate punishment and to achieve adequate deterrence." *Id.*, Executive Summary at vii. In establishing sentences for economic offenses, the Commission made the pecuniary loss resulting from the crime a primary consideration in determining sentences. *Id.* at 55. "The use of imprisonment for economic offenders also has increased steadily throughout the guidelines era." *Id.*

The Guidelines for white collar crimes have also been influenced by numerous formal statutory directives by Congress. *Id.* at 21-22 n.17. Over the years, Congress mandated adjustments of increasing severity to the Guidelines sentences for fraud. *Id.* at 56; *see, e.g.*, Pub. L. No. 103-322, § 2536, § 250003, 108 Stat. 1796 (Sept. 13, 1994) (directing the Commission to review and, if necessary, amend the guidelines to ensure that sentence enhancements for telemarketing fraud and fraud against the elderly were adequate); U.S.S.G. Manual, App. B (listing additional aggravating adjustments to the fraud Guidelines); U.S.S.G., App. C, Amend. 617 (Nov. 1, 2001) (amendments under

8

the "economic crimes package" increased sentences for offenses involving large numbers of victims and larger monetary losses); *see also* United States Sentencing Commission, Report to Congress, Increased Penalties under the Sarbanes-Oxley Act of 2002 (January 2003) (amendments significantly increased guideline penalties under U.S.S.G. § 2B1.1 as directed by the Act).

The Guidelines ensure that offenses involving the greatest monetary losses, the use of more sophisticated methods, and other aggravating factors are given imprisonment. Fifteen-Year Assessment at 57. Notably, "slightly more than 40 percent of both responding district and circuit court judges also would like greater availability of sentencing options (particularly probation-plus-confinement or "split" sentences) for theft and fraud offenses." *Id.*, Summary Report on the U.S. Sentencing Commission's Survey of Article III Judges at 4.

The three steps in the post-*Booker* sentencing process are: (1) "to determine the [initial] advisory guideline sentencing range," (2) to determine "any appropriate departures [upward or downward] from the guidelines[,]" and (3) to decide whether "to vary from the advisory guideline range based on the factors set forth in § 3553(a), so long as such a variance is reasonable." *United States v. Shannon*, 414 F.3d 921, 923-24 (8th Cir. 2005); *see United States v. VandeBrake*, 679 F.3d 1030, 1041 n.7 (8th Cir. 2012).

The Guidelines, under U.S.S.G. § 5K2.0, allow for a departure if there is an aggravating or mitigating circumstance not taken into consideration by the Guidelines. See U.S.S.G. § 5K2.0. Under the Guidelines, a downward departure is permitted if (1) the defendant committed the offense while suffering from "a significantly reduced mental

9

capacity" and this reduced capacity "contributed substantially to the commission of the crime." U.S.S.G. § 5K2.13. Further, the Guidelines provide that specific offender characteristics such as age and physical condition may be relevant in determining whether a departure is warranted. U.S.S.G. § 5H1.1, p.s.; U.S.S.G. § 5H1.4, p.s. Age and physical condition can be considered individually or in combination with other offender characteristics if they are present to an unusual degree and distinguish the case from the typical cases covered by the Guidelines. *Id.; see United States v. McFarlin*, 535 F.3d 808, 811 (8th Cir. 2008); *United States v. Wadena*, 470 F.3d 735, 739-40 (8th Cir. 2006). Under U.S.S.G. 5H1.4, "a court may give a non-prison sentence if the defendant is "seriously infirm" and it would be "as efficient as, and less costly than, imprisonment." U.S.S.G. § 5H1.4; U.S.S.G. § 5H1.1; *McFarlin*, 535 F.3d at 811.

Under U.S.S.G. §5K2.20, a downward departure is warranted if "the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life" and the departure is otherwise not prohibited. U.S.S.G. § 5K2.20. Also, the court can depart on the basis of extraordinary restitution. *United States v. Oligmueller*, 198 F.3d 669, 672 (8th Cir. 1999) (stating "[w]e have previously held that cases can fall outside the heartland when there are extraordinary efforts at restitution").

In the court's determination under 18 U.S.C. § 3553, "[s]ection 3553(a)(2)(D) states that a court may consider the need for medical care when determining a sentence." *McFarlin*, 535 F.3d at 811. After *Booker*, the ability of a defendant to pay restitution is a factor that a district court can consider to impose a sentence outside the

10

Guidelines. See *United States v. Menyweather*, 431 F.3d 692, 702 (9th Cir. 2005) (in an embezzlement case, probation was appropriate because it made the defendant "better able to provide restitution to the victims"); *see* 18 U.S.C. § 3553(a)(7). Similarly, in considering the history and characteristics of the defendant, a court can sentence outside the Guidelines if a defendant is "a law-abiding citizen, who [did] an incredibly dumb thing." *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005).

### B. Analysis

#### 1. Initial Guidelines Calculation

The court accepts the facts set forth in the PSR and finds the defendant's base offense level is 7 plus an increase of 14 levels for a loss between $400,000 and $1,000,000 resulting in an adjusted offense level of 21. After an 3-level adjustment for acceptance of responsibility, the defendant's total offense level is 18. At criminal history category I, the defendant's sentencing range of imprisonment is 27 to 33 months.

#### 2. Departure

The court finds that the defendant's motion for a departure should be granted. The defendant has shown that a departure is warranted based on circumstances of a kind and to a degree not adequately taken into consideration in formulating the guidelines sentencing range. There is evidence that the defendant's mental capacity may have been significantly reduced as a result of his medical conditions and medications. Further, he has shown that his conduct represents a marked deviation from an otherwise law-abiding life. The check-kiting scheme occurred over the course of four months and can be characterized as a single criminal occurrence. The court finds the criminal occurrence did not involve significant planning, as bank-fraud

schemes go, check kiting is relatively simple. In light of the defendant's long and successful business career, the scheme was an isolated mistake. He has no criminal history, has fully accepted responsibility, and has exhibited remorse for his actions.

Mr. Suarez-Reyes has also made extraordinary efforts in restitution in this case that can be considered above and beyond the typical restitution that occurs in a criminal case. He reached a settlement agreement with the bank to pay back the money that was lost before he was criminally charged and has been making restitution payments while on pretrial release. He is presently employed and will be able to make restitution payments in the future.

### 3. Section 3553 Factors

Alternatively, the court would achieve the same result in granting the defendant's motion for a variance or sentence outside the Guidelines.[1] In consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a), the court finds that a sentence of one day of incarceration followed by 5 years of supervised release is sufficient, but not greater than necessary to accomplish the goals of sentencing.

With respect to the nature of the offense, the court notes that check kiting is undoubtedly a serious offense. There is an important public interest at stake in maintain the integrity of financial institutions. The defendant's actions caused a significant loss to TierOne Bank. However, the defendant did not profit from his actions, and that fact tempers his culpability to some degree. Nevertheless, the court finds that a sentence

---

[1] The Eighth Circuit continues "reiterating that 'departures under the Guidelines should still be considered after *Booker*,'" but concludes that a district court's "failure to explicitly consider a departure under the Guidelines represents clear but harmless error" because "the same considerations" that make variance reasonable can also justify a departure under the Guidelines. See *Mireles*, 617 F.3d at 1012.

that includes some brief period of incarceration is necessary to deter other offenders and to achieve some level of proportionality to other economic crimes such as theft and burglary. Incarceration is also necessary to reduce the perception of unwarranted disparity based on socioeconomic status. The brevity of the time to be served is a recognition of the fact that many similar offenders escape prosecution altogether, or are subject only to civil penalties.

The court has considered the history and characteristics of the defendant in fashioning this sentence. See 18 U.S.C. § 3553(a)(1). Suarez-Reyes has no criminal history and, aside from the fraudulent conduct at issue in this case, has been a successful, law-abiding and productive citizen. This is his first offense and can be viewed as an aberrant act in his otherwise law-abiding life. He is employed and making restitution.

The court also finds that some measure of circumstances beyond his control contributed to the losses incurred in this case. Also, he has shown remorse for his actions and the court believes that remorse is sincere. The court finds the defendant took full responsibility for his actions, negotiated in good faith with both TierOne and the government and has been faithful in making restitution payments. He saved the government the expense of a trial and has been doing everything possible to repay the bank. A longer term of imprisonment would disrupt the restitution plan more than necessary.

Further, the court had considered the defendant's medical condition. He has a substantial medical situation and neither he, his victims, nor society would benefit from

his placement in the Bureau of Prisons. He suffers from a host of ailments that can best be medically managed by his own doctors.

In formulating this sentence, the court has considered the sentencing range established by the Guidelines, but, because the fraud offense Guidelines were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court affords them less deference than it would to empirically-grounded Guidelines. The Guidelines calculation, driven as it is by the amount of loss incurred in this case, is one measure of the seriousness of an offense, but is not always a reliable proxy for the culpability of an individual defendant. When losses amount to hundreds of thousands of dollars, the Guidelines' graduated system that aligns culpability with increasing loss is especially skewed. In this case, the amount of loss was magnified by changing economic conditions that were beyond the defendant's control.

Although the amount of loss in this case is significant, the scheme to defraud at issue, a garden-variety check-kiting scheme, is not especially sophisticated or complex. Suarez-Reyes is a businessman who fell prey to the economic downturn, whose businesses failed, and who made poor decisions that ultimately led to his prosecution. Aside from the check kiting, the defendant is not significantly different than many small business owners falling on hard times. To sentence Suarez-Reyes to a Guidelines sentence would exaggerate his culpability and would not be an accurate measure of his blameworthiness vis-à-vis others charged with arguably more sophisticated and far-reaching fraudulent schemes, as well as vis-à-vis those who participate in similar conduct but avoid prosecution.

This sentence also satisfies the need to avoid unwarranted sentencing disparities. This sentence is proportional to other sentences imposed on criminals who have committed white-collar crimes. *See, e.g., United States v. Hergert*, 4:09CR3019 (6 months home confinement and 60 months' probation for financial institution fraud of $3,000,000); *United States v. Trierweiler*, 4:10CR3044 (probation for tax evasion loss of $258,154); *United States v. Weaver*, No. 4:10CR3045 (probation for tax evasion loss of $224,366); *United States v. Snoozy*, No. 4:10CR3009 (one year probation for willful failure to file taxes with a $77,000 criminal tax loss); *United States v. Kohll*, No. 8:04CR409 (one year of probation for a mail fraud scheme involving loss of $500,000); *United States v. Cherek-Ramirez*, No. 8:10CR419 (five years' probation for a mortgage fraud scheme involving $423,000 in loss); *United States v. Therese M. Kehoe*, No. 4:06CR3010 (five years' probation for a mail fraud scheme involving loss of $283,766); *United States v. Weber*, No. 8:08CR209 (2-year term of imprisonment for embezzlement of $467,868); *United States v. McDade*, No. 8:03CR499 (6 months' imprisonment for a $440,194 fraud); *United States v. Lenagh*, No. 8:07CR346 (two-year sentence in a case involving $1,395,000 in health care losses).

This sentence also satisfies the purposes of sentencing. A sentence of one day, followed by 5 years of supervised release reflects the seriousness of the offense, promotes respect for the law and provides just punishment. Most importantly, the sentence will enable the defendant to continue to pay restitution. The court notes the defendant has already suffered serious consequences as a result of his crime. He has lost his businesses, his home, and his stature in the community, and he will suffer the stigma of a felony on his record. These factors, along with the fact of brief incarceration

and five years of supervised release with stringent conditions, will serve to deter others from engaging in similar criminal conduct. The court finds the value of any additional prison time as a deterrent would be marginal. The defendant is unlikely to reoffend, so this sentence is more than sufficient to protect the public from further crimes. Society is protected from future crimes by this defendant by the court's imposition of supervised release.

The court will order restitution in the total amount of 693,776.15, of which $598,276.15 is due and owing.

A Judgment and Commitment and a Statement of Reasons in conformity with this Sentencing Memorandum will issue this date.

DATED this 18th day of December, 2012.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge